[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 20, 2003
THOMAS K. KAHN
CLERK**

No. 02-12520

D. C. Docket No. 00-01897-CV-T-30MAP

LUANNE WALTON,

Plaintiff-Appellant,

versus

JOHNSON & JOHNSON SERVICES,
INC., ORTHO-MCNEIL
PHARMACEUTICAL, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(October 20, 2003)**

Before ANDERSON and WILSON, Circuit Judges, and O'KELLEY[*], District
Judge.

_____

[*]Honorable William C. O'Kelley, United States District Judge for the Northern District of
Georgia, sitting by designation.

PER CURIAM:

Luanne Walton appeals the district court's grant of summary judgment in favor of her employer, Ortho-McNeil Pharmaceutical, Inc. ("Ortho"). Walton sued Ortho under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., claiming that the company was responsible for sexual harassment committed by her supervisor. The district court concluded that although there was a genuine issue of material fact as to whether there was actionable harassment, the employer was entitled to summary judgment on the basis of the affirmative defense recognized by the Supreme Court in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998). Walton appeals that decision.

I.    BACKGROUND

In reviewing the district court's summary judgment order, we must consider all of the evidence in the record, viewing it in the light most favorable to the non-moving party's claims. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). Accordingly, the following account is drawn from the record evidence, viewed in the light most favorable to Walton's allegations.

Walton worked as a pharmaceutical sales representative ("PSR") for Ortho

2

for a number of years preceding the events in question. In 1997, she requested and received a transfer from Virginia to Tampa, Florida. Like many other PSRs, Walton worked out of her home, spending much of her time calling on doctors offices in an effort to persuade doctors to write prescriptions for Ortho products. Each PSR reported directly to a district manager, and the district manager would sometimes accompany the PSR on his or her calls (called a "drive-with").

In January of 1999, Ortho went outside the company and hired George Mykytiuk, of Eli Lilly, to work as the district manager for the Tampa area. Mykytiuk had been referred to Ortho by one of its employees, Lou Ferrerra, who was himself a former Eli Lilly employee. Though Mykytiuk did not directly supervise employees during his tenure at Eli Lilly, he had worked as a national account manager, and based on his business experience in the pharmaceutical industry, Ortho's regional business director, Cathy Wichert, felt that he would be the best candidate for the job. Wichert contacted two other Ortho employees who worked at Eli Lilly while Mykytiuk was there in order to confirm that he had been working in the position he claimed he was. Though the company, when it hired Mykytiuk, did a background investigation (including a criminal history check), it

did not contact his then-current employer or check any of his references.[1]

Mykytiuk was Walton's direct supervisor. Mykytiuk, like the PSRs, worked out of his home office.[2] In April, Walton told Mykytiuk that she was interested in obtaining a promotion to a hospital representative position. Mykytiuk told her that he was well-connected to upper management and that he could assist her in getting the promotion.

On June 14, 1999, Mykytiuk was scheduled to drive with Walton while she made her calls. Instead, Walton claims that Mykytiuk asked her to go shopping with him, took her to a movie, and asked her to accompany him to dinner. Walton claims that Mykytiuk tried to hold her hand during the movie, and that when they parted company that evening, he tried to kiss her. Walton claims that she told Mykytiuk that his behavior was inappropriate and that he apologized and promised never to do it again.

The next day, June 15, Mykytiuk traveled with Walton while she made her calls, ostensibly for the purpose of observing her performance in the field. At some point during the day, Mykytiuk indicated that he needed to go to his office,

---

[1]Ortho, like many companies, has a policy of not contacting current employers due to fears that prospective hires might be terminated from their current position if their employer knew that they were interviewing with another company.

[2]At one time, Ortho maintained office space for district managers and PSRs to meet and conduct business, but that practice was apparently discontinued many years ago.

4

which was at his apartment, in order to finish some inventory paperwork. Walton accompanied him to his apartment. When Mykytiuk finished his paperwork, he told Walton that he did not feel like working the rest of the day. He began talking about his marital difficulties and picked up a gray box and pulled out some letters his wife had written him. He asked Walton to read the letters aloud. At some point thereafter, Mykytiuk took a gun out of the box and showed it to Walton. Later, when Walton was about to leave, Mykytiuk grabbed Walton's breasts and buttocks and attempted to kiss her. She again told him that this behavior was inappropriate, and he again apologized and said it would not happen in the future.

A couple of days later, Walton, at Mykytiuk's request, came by Mykytiuk's apartment and accepted a key and security code to his apartment. Mykytiuk told her that he considered her an assistant manager and that she needed to have access to his office in case he was out of town and needed something faxed to him.

More than a week later, on June 29, 1999, Walton hosted a dinner program for 95 nurse practitioners, a program that Mykytiuk attended. After the dinner was over, Mykytiuk complimented Walton on her performance. He told Walton that he was intoxicated and asked her to follow him home. He indicated that he

wanted to recap the program once they got there.[3] When she arrived at Mykytiuk's apartment, he offered her a glass of wine, which she accepted. He pulled out the gray box, removed the gun, and placed it back in the box after talking about it for a few moments. Mykytiuk continued to talk about his marital difficulties. He next began to compliment Walton, telling her what a good friend she had been to him. He then purportedly jumped on top of her and began to kiss her. Walton claims that she told him "no" and tried to push him away, and that despite her efforts, he physically entered her without her consent. She testified that she fell into a state of shock and that she believes she was raped again later that evening, after Mykytiuk carried her into his bedroom.

Walton did not immediately report the alleged assault to either her employer or the police. The next day, Walton called in sick. She returned to work later that week, and about a week later, on July 8, she attended a lunch business meeting with Mykytiuk. After the meeting, he asked her to give him a ride back to his apartment. When she got there, she was offered and again accepted a glass of wine from Mykytiuk. He asked her to lie down on the floor so that he could give her a

---

[3]In her deposition, Walton claimed that Mykytiuk asked her to come to his home in order to "recap" the meeting. Walton herself contradicts this version of events, however, as her notes indicate that Mykytiuk asked her to come over because he wanted to talk to someone about his marital problems.

massage. She complied, and, according to Walton, Mykytiuk allegedly raped her yet again. After the alleged assault, Mykytiuk apologized to Walton, who was crying. He said that it would not happen again and that they would have a professional relationship in the future.

Once again, Walton did not immediately report Mykytiuk's conduct to either her employer or the police. She did tell her husband the next day that Mykytiuk had tried to kiss her and that he was calling her a lot, making her life very stressful. Though Walton was able to avoid Mykytiuk in the days immediately following the July 8 assault, she claims that Mykytiuk continued with his incessant phone calls. Walton then decided to contact Mykytiuk's psychologist, Dr. Karen Cervenka, hoping that she could persuade Mykytiuk to stop his advances.[4]

On July 21, 1999, Walton had a meeting with Dr. Cervenka. At that meeting, Walton told Dr. Cervenka that one of her patients, George Mykytiuk, was harassing Walton at work. Dr. Cervenka asked Walton whether she had sex with Mykytiuk, and Walton told her that she had, but that she did not "want to." Walton never told Dr. Cervenka that Mykytiuk had raped her. Dr. Cervenka arranged for Walton and Mykytiuk to have a joint session (called a "conjoint"

---

[4] Mykytiuk had apparently mentioned that he had been seeing Dr. Cervenka in his conversations with Walton.

session) to discuss these issues on July 26, 1999. At the conjoint session, Walton and Mykytiuk worked out a 30-day agreement in which he was to no longer call Walton or ask her to his apartment for meetings. In addition, Walton was not to be alone with Mykytiuk at any meetings.

Mykytiuk, however, allegedly violated that agreement on numerous occasions. He showed up uninvited at her house, wanting to go water skiing. And, after driving Walton to a meeting in Orlando on August 21, 1999, Mykytiuk invited Walton to his room so that he could review her "good sales numbers." Though she initially refused, Mykytiuk persuaded her that she could trust him. Once there, he tried to hug and kiss her, and he managed to fondle her breasts and buttocks over her objection. A few days later, on August 26, 1999, after a business dinner, Mykytiuk allegedly pressed Walton to have sex with him again and tried to hug and kiss her. Walton refused and pushed him away.

The next day, August 27, 1999, Mykytiuk asked Walton to give him a ride home after they met with another sales representative in a nearby town. Walton returned to Mykytiuk's apartment, this time for the purpose of using the restroom. While there, Mykytiuk purportedly handed her a "Victoria Secret's" catalogue and told her to pick something out for herself.

During this time period, Walton claims that Mykytiuk continued to make

8

harassing phone calls. At some point in July, Walton had confided to Kim Van Goidstnoven, a friend who worked at one of Ortho's sister companies (a company under the Johnson & Johnson umbrella), that Mykytiuk was paying too much attention to her. Van Goidstnoven talked about this with some of her mangers at that company, and they told Van Goidstnoven that Walton should contact the human resources department and file a complaint. Van Goidstnoven relayed this advice to Walton in mid-August of 1999.

On September 3, 1999, more than two months after the July 8 assault, Walton finally reported Mykytiuk by making an anonymous call to Ortho's human resources department. Walton told Angela Taylor, one of Ortho's human resources representatives, about the June 14-15 incidents in which Mykytiuk had made inappropriate advances and fondled her. Taylor pushed Walton to file a complaint and told her that, based on the information from the call, Taylor already knew who she was and who she was complaining about. After thinking it over the following weekend, Walton called Taylor on September 7, 1999, and named Mykytiuk as the person who made the inappropriate advances. At the time she limited her complaint to the June 14-15 incidents. Taylor informed Walton that Renee Ralph, who was on vacation, would be taking over the investigation. Three days later, Ralph traveled to Tampa and spent several hours interviewing Walton. Walton

9

did not mention the fact that she had been raped; she simply told Ralph that Mykytiuk paid too much attention to her and that he had tried to hug and kiss her on a couple of occasions.

Three days later, on September 13, 1999, Ralph interviewed Mykytiuk. He told Ralph that he and Walton had been involved in an intense and consensual affair, and that Walton had initiated some of the encounters. Ralph suspended Mykytiuk at the end of the interview.

On September 17, 1999, Dr. Cervenka called Walton and told her that Mykytiuk's wife had subpoenaed Cervenka's session notes in connection with Mykytiuk's divorce proceeding. She told Walton that the notes would reveal that Mykytiuk and Walton had been having an affair. Walton purportedly disputed this account, but Dr. Cervenka informed her that she could no longer discuss the matter. Walton then decided to tell her husband that Mykytiuk had raped her on multiple occasions.

On September 20, 1999, Walton called Mykytiuk's manager, Cathy Wichert, to inform her that, in addition to the other incidents previously reported, Mykytiuk had raped her. That same day, Walton reported the alleged rapes to the Tampa

Police Department.[5]

Wichert relayed the rape allegation to Ralph, who then returned to Florida to conduct another interview with Walton. Mykytiuk was also re-questioned by Ortho officials, and he provided Ortho investigators with detailed information to support his claim that the affair was entirely consensual. The investigators interviewed a number of other individuals and ultimately concluded that the affair was consensual, or that, at the very least, they could not rule out such a possibility.

Ortho, however, decided to discharge Mykytiuk for exercising poor judgment. Mykytiuk was formally discharged on December 31, 1999.[6] Shortly thereafter, Ralph invited Walton and her husband to New Jersey for a briefing on the close of the company's investigation. Ralph and Alan Saleeba, Johnson & Johnson's Director of Security, told Walton that they could not conclude that she had been raped and that they were unable to exclude the possibility of a consensual affair. Upon hearing the news, the Waltons were upset and demanded to see someone from upper management. Walton complained, among other things, about the fact that Ortho had not interviewed a number of witnesses who she

---

[5]After reviewing Walton's claims, the Tampa Police Department declined to press charges against Mykytiuk.

[6]Though he was not formally discharged until December 31, 1999, Mykytiuk remained on suspension from September 13, 1999 until the date of his discharge.

claimed could support her version of the events. On January 12, 2000, Michael Carey, Chief Human Resources Officer for Johnson & Johnson, met with the Waltons. Carey listened to their concerns but told them that he had confidence in the integrity of the investigation. He also told Walton that he would be happy to help her return to work, even if it meant placing her in another position in the Johnson & Johnson family.

Walton, however, never returned to work for Ortho or any other Johnson & Johnson company. She went on leave shortly after she reported Mykytiuk's conduct to Ortho officials, and she began collecting short-term disability benefits under Ortho's disability plan. Those benefits expired on May 16, 2000. On May 12, 2000, Ortho informed Walton that her short-term disability benefits were about to expire, and that she had two options. She could either seek long-term disability benefits, assuming she was qualified after an independent medical evaluation, or she could return to work. The company notified her that in order to collect long-term disability benefits, her active employment status would have to be terminated. Walton ultimately decided to go on long-term disability, collecting benefits under that plan until February 2002, when a reviewing physician determined that she was no longer disabled. Her employment with Ortho was terminated on May 17, 2000, when Walton failed to return to work. This suit

followed.

In the district court, Ortho moved for summary judgment, contending that Walton's request to go on disability leave did not constitute an adverse, tangible employment decision and that as a result, any claim she might have against Ortho relating to Mykytiuk's alleged harassment would have to be in the form of a hostile work environment claim. Ortho conceded, at least for purposes of summary judgment, that Walton was subjected to unwelcome sexual harassment. The company argued, however, that it was entitled to summary judgment based on the affirmative defense recognized by the Supreme Court in <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275 (1998) (hereinafter "<u>Faragher</u> defense").

The district court concluded that Ortho was entitled to summary judgment on the basis of the <u>Faragher</u> defense. The district court held that there was no genuine issue of material fact as to whether Ortho acted reasonably to prevent and then promptly correct any sexually harassing behavior. In addition, the court concluded that Walton failed to take advantage of Ortho's anti-harassment policy, and that her failure to do so could not be considered reasonable under the circumstances. The court therefore entered summary judgment on behalf of Ortho with respect to Walton's sexual harassment claim under Title VII.

13

## II. STANDARD OF REVIEW

We review a district court's order granting summary judgment de novo, viewing the facts in the record in the light most favorable to the non-moving party, and drawing all inferences in that party's favor. See Frederick v. Sprint/United Mgmt. Corp., 246 F.3d 1305, 1311 (11th Cir. 2001). "Summary judgment is only proper if there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law." Id.

## III. DISCUSSION

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Noting that the phrase "'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the spectrum of disparate treatment of men and women in employment," the Supreme Court in Meritor Savings Bank, FSB v. Vinson held that intangible forms of discrimination, such as being forced to work in a sexually hostile work environment, constitute actionable discrimination under Title VII. 477 U.S. 57, 64, 106 S.Ct. 2399, 2404

14

(1986).  Not all forms of conduct that may be described as "harassment," however, affect a "term, condition, or privilege" of employment within the meaning of Title VII.  "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment." Id. at 67, 106 S.Ct. at 2405 (alteration in original) (internal quotation marks and citations omitted).  See also Harris v. Forklift Sys., Inc. 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993) (noting that a hostile work environment exists under Title VII where "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (quoting Meritor, 477 U.S. at 65, 106 S.Ct. at 2405).

To establish a hostile work environment claim under Title VII, a plaintiff must therefore show the following:

> (1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [the employee's sex]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  For

15

summary judgment purposes, Ortho apparently concedes that there is a genuine issue of material fact as to whether Walton was subjected to unwelcome sexual harassment. The company also does not contest the fact that a genuine issue of material fact exists as to whether that harassment was so severe and/or pervasive that it created a hostile working environment. The sole issue before this Court as it relates to Walton's claim of discrimination under Title VII is whether Ortho can be held vicariously liable for the actions of Mykytiuk.

The Supreme Court first touched on the issue of employer liability for the harassing conduct of supervisory employees in Meritor. In light of the factual record, the Court was unwilling to provide a definitive rule on the subject. It did, however, reject the two most extreme positions with respect to employer liability. It rejected the notion "that employers are always automatically liable for sexual harassment by their supervisors." Meritor, 477 U.S. at 72, 106 S.Ct. at 2408 (citing Restatement (Second) of Agency §§ 219-237). Conversely, the Court rejected the proposition that "absence of notice to an employer . . . necessarily insulate[s] that employer from liability." Id. (citing Restatement (Second) of Agency §§ 219-237 (1958)). Other than marking these boundary lines, the Court in Meritor merely indicated that courts should look to traditional principles of agency law in deciding whether an employer is liable for the harassing conduct of

16

one of its employees, though the Court cautioned that those "common-law principles may not be transferable in all their particulars to Title VII . . . ." Id.

The Supreme Court revisited the question of employer liability for the harassing conduct of supervisory employees in Ellerth and Faragher. In Frederick v. Sprint/United Management Co., we summarized the Court's holdings:

> In Ellerth and Faragher, the Supreme Court indicated that courts should no longer use the labels "quid pro quo" and "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment. Ellerth, 524 U.S. at 753, 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807, 118 S.Ct. 2275 (applying new standard). Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions. Ellerth, 524 U.S. at 761-63, 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 790, 807, 118 S.Ct. 2275; see also Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501, 508 (11th Cir.2000) (recognizing shift in terminology). Under this analysis, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held vicariously liable for the harassment. Ellerth, 524 U.S. at 763, 118 S.Ct. 2257; Faragher, 524 U.S. at 790, 118 S.Ct. 2275. In contrast, when the supervisor's harassment involves no adverse "tangible employment action," an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the Faragher and Ellerth cases ("Faragher/Ellerth affirmative defense"). Ellerth, 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807, 118 S.Ct. 2275.

17

246 F.3d 1305, 1311 (11th Cir. 2001). Walton claims that Ortho's termination of her employment, following her request for long-term disability benefits, constitutes a tangible employment action to which no affirmative defense is available. Alternatively, she insists that a genuine issue of material fact exists as to whether Ortho satisfied the requirements of the Faragher affirmative defense. We address these claims in turn.

A.   Does Walton's Claim Of Harassment Satisfy The Tangible Employment Action Requirement.

Walton contends that she suffered a tangible job detriment when Ortho terminated her from active service on May 17, 2000. In order to obtain long-term disability benefits, Walton's active employee status had to be terminated. Ortho informed Walton of this fact, and notified her that on May 17, 2000, she could return to work or go on long-term disability leave. Walton ultimately decided to collect the disability benefits and did not return to work. Consequently, on May 17, 2000, Ortho removed her from active service. Walton claims that the discharge itself amounts to a tangible employment action. She claims that because the disability was the product of her supervisor's harassment, any discharge resulting from that disability must be charged against the company.

18

As the Supreme Court recognized in Ellerth, "[w]hen a party seeks to impose vicarious liability based on an agent's misuse of delegated authority, the Restatement's aided in the agency relation rule, rather than the apparent authority rule, appears to be the appropriate form of analysis." 524 U.S. at 759-760, 118 S.Ct. at 2268. When a company official makes a tangible employment decision, "there is assurance the injury could not have been inflicted absent the agency relation." Id. at 761-62, 118 S.Ct. at 2269. Thus, "[w]hatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate." Id. at 762-63, 118 S.Ct. at 2269. A discharge is unquestionably a tangible employment decision. See id. at 761, 118 S.Ct. at 2268 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change of benefits.") (emphasis added). There is, therefore, no question but that Walton's discharge constitutes a tangible employment action.

The problem for Walton is that there is absolutely no evidence in the record that she was discharged (as opposed to being harassed) because of her sex. To the contrary, the undisputed evidence shows that Walton was discharged because she

19

elected to take disability rather than return to work.

Walton claims that because the disability resulted from the harassment of one of Ortho's supervisors, there is a causal link between the harassment and the discharge. The question we must concern ourselves with, however, is whether Ortho, when it terminated Walton, took her gender into account. And there is no evidence that Ortho, or any of the employees acting on its behalf, considered Walton's gender when the company terminated her.[7] To the contrary, the undisputed evidence is that Walton was terminated because she failed to return to work after her short-term disability benefits expired in order to preserve her eligibility for long-term disability benefits. The district court therefore correctly determined that Walton was unable to establish a genuine issue of material fact as to the reason for Walton's termination.

That is not to say that a company can escape liability where it ostensibly discharges an individual for not returning to work even though that individual was, as a practical matter, forced to resign by company officials. We permit plaintiff-employees to recover discharge damages when the plaintiff is

---

[7]Though Mykytiuk's conduct may be imputed to Ortho (subject to the affirmative defense recognized in Ellerth/Faragher), Walton has not shown that he played a role in the decision to terminate her. In fact, when Ortho discharged Walton, Mykytiuk had already been terminated. To the extent that Walton claims that Mykytiuk's conduct precluded her from returning to work, that claim is properly considered as a constructive discharge claim, as we discuss infra.

"constructively discharged." To succeed on such a claim, the plaintiff, who bears the burden of proof, must show that her working conditions were "so difficult . . . that a reasonable person would have felt compelled to resign." Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) (internal quotation marks and citations omitted). The plaintiff must do more than merely show that she was subjected to actionable harassment. "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001).

Walton did not attempt to prove that a reasonable person would have felt compelled to resign under the circumstances presented here. She instead focuses all of her attention on her subjective reaction to the alleged harassment. She insists that so long as an employee can show that she was forced to leave because of the harassment she experienced, the employer is liable for any resulting discharge. Accepting that position would eviscerate the objective standard for constructive discharge. In any case where a plaintiff could show that she was unable to continue working in the face of a sexually hostile working environment, even where the conditions were not sufficient to compel a reasonable person to resign, the employer would be responsible for any damages relating to the

21

discharge. That position is clearly inconsistent with the objective test for constructive discharge adopted by our Circuit.

We need not decide whether a claim of constructive discharge would fail given the facts in the record. Because Walton did not press her constructive discharge claim in the court below, the district court never squarely addressed the issue of whether a reasonable person would have felt compelled to resign under the circumstances.[8] Though we sometimes permit a party to raise legal issues they did not raise below, see Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360-61 (11th Cir. 1984) (noting several exceptions to the general rule that appellate courts will not consider an issue unless it was first presented to the trial court), we are unwilling to do so here because Walton's counsel expressly disavowed the notion that constructive discharge was even an issue in the case. See Pl.'s Br. in Opp. to Defs.' Mot. Summ. J. (noting that cases cited by the defendant "address an issue . . . not present in this case," namely "whether a constructive discharge can qualify as a tangible job detriment under Faragher"). Thus, to the extent the district court erred in failing to construe Walton's tangible employment action claim as a constructive discharge claim, that error was invited

---

[8]The district court did intimate that a constructive discharge claim would not lie here. Because Walton argued that constructive discharge was not an issue in this case, we offer no opinion as to the accuracy of the district court's observation.

22

by counsel and cannot be reviewed on appeal. See Glassroth v. Moore, 335 F.3d 1282, 1290 (11th Cir. 2003) (recognizing the long-standing rule of appellate procedure that "a party may not challenge as error a ruling or other trial proceeding invited by that party.") (quotation marks and citations omitted).

In short, the undisputed facts conclusively demonstrate that Walton was discharged because she failed to return to work and that her gender played no motivating role in Ortho's decision. And, because Walton did not assert that she was constructively discharged as a result of the harassment by Mykytiuk, we need not decide whether a constructive discharge is a "tangible employment action" for purposes of the Ellerth/Faragher analysis.[9] See Hardy v. Univ. of Ilinois, 328 F.3d 361, 364 (7th Cir. 2003) (refusing to address constructive discharge because plaintiff, who claimed that she resigned and went on medical leave as a result of the alleged harassment, had not raised that claim in the court below). We therefore turn to Walton's remaining claim, that she was subjected to a sexually

_____

[9]There is considerable disagreement among the circuits with respect to that issue. Compare Suders v. Easton, 325 F.3d 432, 461 (3d Cir. 2003) (holding that a constructive discharge constitutes a tangible employment action under Faragher/Ellerth), and Jaros v. LodgeNet Entm't Corp., 294 F.3d 960, 966 (8th Cir. 2002) ("[A] constructive discharge constitutes a tangible employment action which prevents an employer from utilizing the [Faragher/Ellerth] affirmative defense."), with Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 294 (2d Cir. 1999) (concluding that a "constructive discharge does not constitute a 'tangible employment action,' as that term is used in Ellerth and Faragher.").

23

hostile work environment.[10]

> B. Walton's Alternative Claim That Ortho Is Liable For The Hostile Work Environment Created By Her Supervisor.

Walton claims that she was subjected to a sexually hostile work environment, beginning in June 2000 and continuing up and until she went on disability leave in September of that same year. For purposes of summary judgment, Ortho does not dispute the fact that there is a genuine issue of material fact as to whether Walton was subjected to unwelcome sexual advances, including multiple allegations of rape, during this time period. Ortho instead contends that it is not liable for this harassment under the terms of the affirmative defense recognized by the Supreme Court in Ellerth and Faragher.

In Faragher, the Supreme Court addressed the disparate standards used in the various circuits with respect to employer liability for the harassing conduct of

---

[10]Walton argues for the first time in her reply brief that the alleged rapes on June 29, 1999 and July 8, 1999, by themselves, constitute tangible employment actions. We decline to address that argument because it was not raised below. As noted above, Walton argued in the district court (and in her initial brief) only that there was a tangible employment action because her discharge in May 2000 was the result of the sexual harassment. Indeed, in the district court, Walton expressly disavowed asserting a constructive discharge claim, which might be closely related to the issue now raised for the first time in her reply brief. Had Walton raised the issue in the district court, Ortho would have had an opportunity to respond thereto, and the district court would have addressed same. Ortho also may have been able to adduce additional relevant evidence.

24

supervisory employees. The Court began its analysis by noting that it was building on the foundation previously laid in Meritor, which as we noted supra, held that courts should look to traditional principles of the law of agency in defining employer liability. The Court then proceeded to address the three grounds for vicarious employer liability identified by the lower court: (1) liability under an "acting within the scope of employment" theory; (2) liability under an "aided by agency" theory; and (3) liability flowing from the employer's negligence.

The Court declined to rely on the "scope of employment" theory, noting that courts had uniformly rejected (either explicitly or implicitly) the notion that co-workers act within the scope of their employment when they harass fellow employees. Faragher, 542 U.S. at 799-800, 118 S.Ct. at 2289. Because the Court, using the "scope of employment" theory, could not principally distinguish those cases from ones involving supervisory harassment, see id. at 800, 118 S.Ct. at 2289, the Court next addressed the idea that employers may be liable for supervisory harassment under an "aided by agency" theory. Specifically, the Court looked to Restatement (Second) of Agency § 219(2)(d), which provides that an employer "is not subject to liability for the torts of his servants acting outside the scope of their employment unless . . . the servant purported to act or speak on

25

behalf of the principal and there was reliance on apparent authority, or he was

aided in accomplishing the tort by the existence of the agency relation." (emphasis

added). Relying on this provision, the Court explained that "in implementing Title

VII it makes sense to hold an employer vicariously liable for some tortious

conduct of a supervisor made possible by abuse of his supervisory authority, and

that the aided-by-agency-relation principle embodied in § 219(2)(d) of the

Restatement provides an appropriate starting point for determining liability" for

supervisory harassment. Faragher, 524 U.S. at 802, 118 S.Ct. at 2290. The Court

then provided several reasons for adopting this theory of liability:

> The agency relationship affords contact with an employee subjected
> to a supervisor's sexual harassment, and the victim may well be
> reluctant to accept the risks of blowing the whistle on a superior.
> When a person with supervisory authority discriminates in the terms
> and conditions of subordinates' employment, his actions necessarily
> draw upon his superior position over the people who report to him, or
> those under them, whereas an employee generally cannot check a
> supervisor's abusive conduct the same way that she might deal with
> abuse from a co-worker. When a fellow employee harasses, the victim
> can walk away or tell the offender where to go, but it may be difficult
> to offer such responses to a supervisor, whose "power to
> supervise--[which may be] to hire and fire, and to set work schedules
> and pay rates--does not disappear . . . when he chooses to harass
> through insults and offensive gestures rather than directly with threats
> of firing or promises of promotion." Estrich, Sex at Work, 43 Stan.
> L.Rev. 813, 854 (1991). Recognition of employer liability when
> discriminatory misuse of supervisory authority alters the terms and
> conditions of a victim's employment is underscored by the fact that
> the employer has a greater opportunity to guard against misconduct

by supervisors than by common workers; employers have greater opportunity and incentive to screen them, train them, and monitor their performance.

Id. at 803, 118 S.Ct. at 2291. The Court thus announced that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Id. at 807, 118 S.Ct. at 2292-93.[11]

Ortho, for summary judgment purposes at least, does not contest the fact that Walton was subjected to an actionable hostile environment.[12] Nor does the

---

[11]Because the Court endorsed the aided-by-agency theory of liability, it declined to rule on the question of whether the employer could be held responsible for supervisory harassment under a negligence or imputed knowledge theory. See Faragher, 524 U.S. at 810, 118 S.Ct. at 2294.

[12]For sexual harassment to rise to the level where it alters the terms and conditions of employment, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787; 118 S.Ct. at 2283. In addressing the objective hostility of the conduct, we look at four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999). We must then decide, looking at the totality of the circumstances, "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." Id.

Generally speaking, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788, 118 S.Ct. at 2283. We can think of few incidents, isolated or not, that are more serious than those alleged to have occurred in this case. Because Ortho does not contest the fact that Walton was subjected to an actionable level of harassment, we assume that the allegations of fondling and sexual assault are sufficient to create a sexually hostile and abusive work environment that altered the terms and conditions of Walton's employment.

27

company dispute the notion that, to the extent there was any unwelcome harassment here, Mykytiuk's position as a supervisor aided his ability to engage in harassing behavior. Thus, we assume for purposes of this appeal that Walton was subjected to an actionable level of harassment by her supervisor.

Under the rule announced in Faragher, Walton has established a prima facie case for holding Ortho liable for Mykytiuk's alleged harassment. There is, however, an important qualification to Faragher's rule of vicarious liability. Though the Court indicated that an employer should be held vicariously liable for the harassment of its supervisors, it recognized that the rule it announced created some tension with its earlier pronouncement in Meritor, where it rejected the idea that an employer should be "always automatically liable for sexual harassment by their supervisors," see Meritor, 477 U.S. at 72, 106 S.Ct. at 2408. Faragher, 524 U.S. at 804, 118 S.Ct. at 2291 (describing the tension between the theory of liability it endorsed and the Court's earlier holding in Meritor). In the Court's view, there were two basic alternatives to the rule of automatic liability. The first was to recognize a rule whereby the harassing supervisor would have to affirmatively invoke his authority in order for the employer to be held liable. The Court rejected that idea because it was impractical in application and would lead to endless litigation over whether a supervisor's authority was implicitly invoked.

Id. at 805, 118 S.Ct. at 2292. The Court then explained that:

> The other basic alternative to automatic liability would avoid this particular temptation to litigate, but allow an employer to show as an affirmative defense to liability that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with . . . reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided.

Id. Thus, the Court held that "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c)." Id. at 807, 118 S.Ct. at 2293. According to the Court, "[t]he defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

The district court granted Ortho summary judgment on the basis of this affirmative defense. It concluded that there was no genuine issue of material fact as to whether Ortho had taken reasonable measures to prevent and correct sexually harassing behavior. The district court also ruled for Ortho on the second element of the affirmative defense, holding as a matter of law that Walton unreasonably

failed to take advantage of Ortho's remedial mechanisms or to otherwise avoid harm. We examine each of these issues in turn.

1.    Whether Ortho Acted Reasonably To Prevent And Promptly Correct Sexually Harassing Behavior.

As we have previously recognized, in crafting the first prong of the Faragher affirmative defense, which in part requires employers to take reasonable measures to prevent harassment, "the Supreme Court sought to give effect to Title VII's deterrent purpose." Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1297 (11th Cir. 2000). The Court in Faragher "implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy." Madray, 208 F.3d at 1297-98. In fact, "dissemination of an employer's anti-harassment policy [is] fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment." Id. at 1298.

In addition to promulgating an anti-harassment policy, an employer must also ensure that the policy itself adequately addresses Title VII's deterrent purpose. "The employer's size, location, geographic scope, organizational structure, and industry segment are just some of the characteristics that impact the

30

analysis of whether the complaint procedures of an employer's anti-harassment policy adequately fulfill Title VII's deterrent purpose." Id. At a minimum, employers must "establish a complaint procedure 'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor.'" Id. (quoting Faragher, 524 U.S. at 806, 118 S.Ct. at 2292 (alteration in original) (citations omitted)).

Walton claims that there is a genuine issue of material fact as to whether Ortho acted reasonably to prevent Mykytiuk's sexually harassing behavior. With respect to Ortho's efforts to reasonably prevent the harassing behavior, Walton points out that: (1) Ortho failed to check Mykytiuk's references or contact his current employer before hiring him; (2) Ortho discontinued its practice of leasing office space; and (3) Ortho's complaint procedure was defective because it failed to name the person to whom grievances should be submitted.

The district court properly rejected each of these contentions. It is a common practice for employers to refrain from contacting a prospective employee's current employer before hiring that person. Should a company contact a candidate's current employer and then decide not to give that person an offer, the prospective employee might be out of a job altogether. Ortho did, however, talk to two employees who knew of Mykytiuk through their previous jobs at Eli Lilly.

31

And, the company did conduct a criminal background check. Under the circumstances, we cannot say that a genuine issue of material fact exists as to whether Ortho acted reasonably to prevent harassing behavior based on Ortho's failure to conduct a more thorough investigation. We also note that there is no evidence that Mykytiuk was ever subjected to a claim of sexual harassment at his previous job and that a more diligent search, therefore, would have put Ortho on notice that Mykytiuk was likely to engage in such behavior in the future.

We also find no merit in Walton's contention that Ortho acted unreasonably by failing to secure office space for its employees. There were any number of public accommodations in which employees could (and often did) meet to discuss business matters. The fact that the company did not secure office space, therefore, does not suggest that it acted in an unreasonable manner to prevent harassment from occurring.

Finally, we do not believe that the policy was defective because it failed to name the specific person to whom a grievance should be submitted. There is no dispute that Ortho promulgated an anti-harassment policy that was distributed to Walton. In pertinent part, the policy provided that:

> Complaints of discrimination or harassment will be investigated and resolved by the <u>Human Resources Department</u>. If an associate feels he/she is the victim of discrimination or harassment, he/she should

32

report it to their supervisor/manager. If this is not appropriate, the associate should request a confidential discussion with the appropriate Organizational Effectiveness representative.

Upon impartial investigation, any associate found to have discriminated against or harassed another associate will be subject to immediate disciplinary action up to and including termination.

(emphasis added). The company's anti-harassment policy provides an alternative channel for making complaints other than the harassing supervisor. Cf. Montero v. Agco Corp., 192 F.3d 856, 862 (9th Cir. 1999) (concluding that company exercised reasonable care to prevent harassment where its policy identified only an employee's supervisor and the company's human resources department as the proper outlets for sexual harassment complaints), cited in Madray, 208 F.3d at 1299. Though the policy does not designate a specific "Organizational Effectiveness" representative, it clearly indicates that all complaints will be handled by the "Human Resources Department." If Walton had question as to who the "Organizational Effectiveness" representative referred to in the policy was, she could have contacted Human Resources and asked them. We think the policy sufficiently informs harassment victims that complaints should be addressed to that department.[13]

---

[13]In addition, Ortho claims that it sent a slightly different copy of its anti-harassment policy to its employees each year. A January 25, 1999 letter, addressed to "ALL OMP ASSOCIATES" notes that:

Walton also contends that a triable issue of fact exists as to whether Ortho acted reasonably to correct the harassing behavior. Specifically, she claims that Ortho's failure to conduct a prompt and thorough investigation of her allegations excludes the possibility that the company acted reasonably in correcting the complained of harassment. We disagree. Walton first contacted Ortho's human resources department on September 3, 1999. After a follow up conversation a few days later, a member of that department arranged a meeting with Walton in Tampa on September 10, 1999. At that meeting, she indicated that Mykytiuk was paying too much attention to her and that he had attempted to kiss her and fondle her in June of 1999. Three days later, on September 13, 1999, the company's

---

> Associates are encouraged to report incidents of harassment to their immediate supervisor. In instances where a supervisor may be involved in the incident, misconduct should be reported to a higher level of management or to a Human Resources Representative. We have an employee complaint procedure for investigating and resolving such complaints.

To the extent that the policy manual created any confusion as to where complaints should be lodged, we believe this policy clears up that confusion.

In her brief, Walton claims that she never received this letter. Her actual testimony is much more ambiguous, however. When asked why she never received a copy of the company's harassment policy, Walton said "if [Ortho officials] mail something out, they probably mail it out with a bunch of other stuff, easily to be thrown away. Who knows? Who knows if I even got it?" Walton also introduced testimony from another sales representative who did not recall getting such a letter. The fact that neither Walton nor another employee remember receiving the policy (as opposed to being able to definitely testify that they never received it), is not particularly probative of whether Walton did in fact receive a copy of the policy. In any event, we believe the policy manual provided employees with sufficient guidance about filing a complaint.

34

investigative staff met with Mykytiuk. He informed them that he and Walton had been involved in a consensual affair and that they had engaged in sexual intercourse on numerous occasions. At the end of the interview, Mykytiuk was immediately suspended from active service, where he remained until his discharge on December 31, 1999.

According to the EEOC, "[r]emedial measures should be designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur." EEOC Notice No. 915.002, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, at § V.C.1.f. (June 18, 1999), available at http://www.eeoc.gov/docs/harassment.html. Ortho's remedial measures did just that. Immediately after Walton filed a complaint with Ortho's human resources department, Ortho suspended Mykytiuk and took measures to ensure Walton would not have to work under him again. And, after conducting an investigation, the company ultimately discharged Mykytiuk. Walton was given an opportunity to return to active service, and she does not claim that she lost any benefits during the time in which she was employed at the company as a result of the alleged harassment.

Walton points to a number of claimed inadequacies in the investigation, such as the company's failure to interview critical witnesses and its failure to

35

reconcile inconsistent statements from the witnesses who were interviewed. Had the company not taken reasonable measures to correct the harassment, Walton's complaints might have some merit. Cf. Dhyne v. Meiners Thriftway, 184 F.3d 983, 988 (8th Cir. 1999) (concluding that an issue of fact existed as to whether employer's response to complaint of harassment was reasonable where the employer waited nearly two months after the employee's initial complaint before it transferred the alleged harasser). But where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow.[14] We thus agree with the district court that there is no genuine issue of fact as to whether Ortho

---

[14]Walton also claims that Mykytiuk made harassing phone calls to her even after he was suspended and that Ortho failed to adequately address that conduct. Walton, however, was unable to present Ortho with evidence of such calls prior to the date on which Mykytiuk was terminated. Thus, we cannot say that Walton made out a triable issue of fact on this question.

Walton's chief complaint with Ortho's investigative process is that the company did not appear to believe her version of the events. The company, however, had good reason to doubt her version of the events. Walton initially informed company officials that Mykytiuk made inappropriate advances and tried to fondle her in June of 1999. After interviewing Mykytiuk, the company learned that Walton and Mykytiuk had engaged in sexual intercourse. Walton subsequently amended her story and added multiple claims of rape, including her claim that she returned to the very same apartment where she was raped on multiple occasions. Given these facts, as well as the Tampa Police Department's decision not to charge Mykytiuk, the employer could have reasonably concluded that Walton, who is married, had been involved in a consensual affair with her supervisor. At the very least, the company could have reasonably concluded that they would not be able to exclude the possibility of a consensual relationship and that the safest course of action might be to terminate Mykytiuk for poor judgment and keep Walton in her former position. Because the employer quickly removed Mykytiuk from active service and ensured that he would not work with Walton in the future, we conclude that Walton failed to create a question of fact as to the reasonableness of the employer's conduct.

acted reasonably to prevent and correct sexually harassing behavior.

> 2. Whether Walton Unreasonably Failed To Take Advantage of Ortho's Remedial Measures or Otherwise Avoid Harm.

In order to succeed on the Faragher defense, the employer also bears the burden of proving the second element of that defense, "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer, or to otherwise avoid harm." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001) ("Both elements [of the Faragher defense] must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements."). "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Faragher, 524 U.S. at 807-08, 118 S.Ct. at 2293.

In the court below, Ortho argued that Walton unreasonably failed to take advantage of the employer's anti-harassment policy by failing to report the alleged harassment, which began in mid-June of 1999, until September 3 of that same

37

year. Walton responded in three ways. First, she claimed that she advised her supervisor that his advances were unwelcome. Second, she argued that she waited a mere five days after the last act of harassment to file a complaint and that there was, therefore, no unreasonable delay. Finally, she claimed that to the extent there was a delay in reporting the alleged harassment, that delay was reasonable because (a) she feared that she would not get the hospital representative position Mykytiuk had discussed with her, (b) she feared that she might lose her current job given Mykytiuk's purported connections to upper management, and (c) she feared for her safety after Mykytiuk showed her his gun while she was in his apartment.[15]

The district court correctly rejected these arguments. The fact that Walton advised her supervisor that his advances were unwelcome is relevant, of course, but she did not argue in the district court that, based on these warnings, she had reason to believe that the advances would stop, particularly after those warnings

---

[15]Walton also argues that Ortho was on notice of the harassment in August of 1999 because her friend, Kim Van Goidstnoven, told officials at Ortho's parent company that Walton's supervisor had made inappropriate advances. We agree with the district court that this argument lacks merit. Neither Van Goidstnoven, nor the officials she talked to at Johnson & Johnson, were charged with the responsibility of addressing such complaints, and the communication was not reasonably calculated to reach the responsible officials (i.e., Ortho's human resources department). See Madray, 208 F.3d at 1302 (holding that amorphous complaints to persons not authorized to accept complaints does not constitute a reasonable effort to take advantage of employer's complaint procedures). Indeed, as Van Goidstnoven's testimony makes clear, she did not file a complaint with the individuals at the sister company; she instead asked them what her friend, who worked at a related but distinct company, should do under the circumstances.

had already proven to be unsuccessful.[16]  Furthermore, the fact that Walton waited

five days after the last alleged incident of harassment is not very significant in

assessing the reasonableness of her failure to report the harassment after it began

in June.  Had Walton notified Ortho officials in June, when the harassment

initially began, most of the incidents complained of could have been avoided.

Instead, after Mykytiuk groped her breasts and buttocks and tried to kiss her the

day after he promised to behave, Walton claims that she went back to his

apartment over a week later, knowing that he was intoxicated, had wine with him,

and was then subjected to the more serious incident of sexual assault.  Indeed, she

admits returning to the apartment the following week, accepting wine again, and

lying down on the floor to be massaged, whereupon she alleges that she was

sexually assaulted again.

We are mindful of the fact that severe harassment such as that which is

alleged to have occurred here can be particularly traumatic.  As we have pointed

out before, however, "the problem of workplace discrimination . . . cannot be

[corrected] without the cooperation of the victims."  Madray, 208 F.3d at 1302

---

[16]If anything, the facts suggest the contrary.  Walton warned Mykytiuk on June 14 that his advances, which included inappropriate comments and an attempt to kiss her, were unwelcome.  Yet, just a day later, Mykytiuk allegedly committed a more egregious infraction when he fondled Walton's breasts and buttocks while attempting to kiss her.

(alteration in original) (quoting <u>Coates v. Sundor Brands, Inc.</u>, 164 F.3d 1361, 1366 (11th Cir. 1999)). Thus, the victim of the alleged harassment has an obligation to use reasonable care to avoid harm where possible. <u>See</u> <u>Faragher</u>, 524 U.S. at 807, 118 S.Ct. at 2292 ("If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided."). As the First Circuit recently noted,

> Reporting sexually offensive conduct by a supervisor would for many or most employees be uncomfortable, scary or both. But because this will often or ordinarily be true, as the Supreme Court certainly knew, its regime necessarily requires the employee in normal circumstances to make this painful effort <u>if the employee wants to impose vicarious liability on the employer and collect damages under Title VII</u>.

<u>Reed v. MBNA Mktg. Sys., Inc.</u>, 333 F.3d 27, 35 (1st Cir. 2003). Here, Walton could have avoided most, if not all, of the actionable harassment by reporting Mykytiuk's behavior to Ortho officials. By failing to do so, Walton did not give Ortho an opportunity to address the situation and prevent further harm from occurring.

We also agree with the district court that absent a credible threat of retaliation, Walton's subjective fears of reprisal do not excuse her failure to report

40

Mykytiuk's alleged harassment. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999) (concluding that plaintiff's failure to report harassment for several months was not based on a "credible fear" that her complaint would fall on deaf ears or that she would suffer an adverse employment action as a result of her decision to file a complaint); Shaw v. Autozone, Inc., 180 F.3d 806, 813 (7th Cir. 1999) (holding that plaintiff's subjective fear that she would suffer retaliation for filing a complaint not sufficient to excuse delay in reporting incidents of harassment). Subjective fears of reprisal may exist in every case, but, as we discussed supra, those fears, standing alone, do not excuse an employee's failure to report a supervisor's harassment. Here, Mykytiuk never told Walton that her job was in jeopardy, nor did he threaten her with physical harm.[17] We therefore conclude that Walton did not reasonably avail herself of the protections afforded by Ortho's anti-harassment policies, and the district court thus correctly held that Ortho was entitled to the Faragher defense as a matter of law.

---

[17]Walton did not indicate that Mykytiuk threatened her in any way when he showed her his gun. She merely indicated that the gun "intimidated" her. We have no quarrel with that claim, but we are unwilling to say that her subsequent failure to report Mykytiuk, when she was out of his presence, was reasonable due to her subjective fear that Mykytiuk might physically harm her. Indeed, the second prong of the Faragher defense would be rendered meaningless if a plaintiff-employee could escape her corresponding obligation to report sexually harassing behavior based on an unsupported subjective fear that the employee would suffer physical harm at the hands of her alleged harasser.

On appeal, and for the first time, Walton argues that even if she acted unreasonably by failing to report many of these incidents after they occurred, she could not have avoided the sexual assaults on June 29, 1999. She thus contends that Ortho, at the very least, should be liable for the harassment that occurred on that date.

At least three other circuits have addressed, in some form, the practical difficulties of applying Faragher in cases involving claims of "sudden sexual harassment." The question faced in those cases is whether an employer is liable for the harassment committed by its supervisors where neither party is at fault – i.e, where the employer acts reasonably to prevent and correct any sexually harassing behavior, and where the employee avails herself, to the extent that she can do so, of any protections afforded by her employer. One circuit has held that an employer is liable for any harassment that occurred prior to the corrective action. See Greene v. Dalton, 164 F.3d 671, 674-75 (D.C. Cir. 1999) (holding that the defendant could avoid liability in connection with a claim that a supervisor sexually assaulted a subordinate only if the defendant could show that the plaintiff failed to act reasonably in reporting the supervisor's behavior prior to the sexual assault). Two other circuits have addressed the issue but have not rendered a definitive holding. See Todd v. Ortho Biotech, Inc., 175 F.3d 595, 598

(8th Cir. 1999) (explaining that the <u>Faragher</u> defense, which was "adopted in cases that involved ongoing sexual harassment in a workplace, . . . may not protect an employer from automatic liability in cases of single, severe, unanticipatable sexual harassment" and that the district court should address that issue on remand") & 599 (Arnold, J., concurring) (noting that the affirmative defense in <u>Faragher</u> affects both liability and damages, and that in cases of sudden sexual harassment, the defense merely lessens the defendant's damages, it does not "erase the tort completely."); <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258, 267 (5th Cir. 1999) (opinion by Jones, J. with the other two panel members concurring in the judgment only, Judge Wiener concurring specially, <u>see</u> <u>infra</u>)) (Judge Jones assumed <u>arguendo</u> that a hostile environment claim had been stated, albeit a dubious one, and concluded that the employer is not vicariously liable for actionable harassment where both the employee and the employer act reasonably and promptly to address the situation); 168 F.3d 795, 804 n.52 (Wiener, J., specially concurring) (arguing that under <u>Faragher</u> and <u>Ellerth</u>, where a supervisor engages in "sufficiently severe conduct," such as rape, an employer may be vicariously liable even though the employer took prompt remedial action based on an employee's equally prompt complaint). The EEOC takes the position that an employer is liable where both parties act reasonably to prevent and correct any

43

sexually harassing behavior. See EEOC Notice No. 915.002, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, at § V.B. (June 18, 1999), available at http://www.eeoc.gov/docs/harassment.html. ("In some circumstances, . . . unlawful harassment will occur and harm will result despite the exercise of requisite legal care by the employer and employee. . . . In these circumstances, the employer will be liable because the [Faragher/Ellerth] defense requires proof that it exercised reasonable legal care and that the employee unreasonably failed to avoid the harm.").

We need not weigh in on this debate because Walton failed to raise this theory below. In moving for summary judgment, Ortho argued that Walton had unreasonably failed to take advantage of its anti-harassment policies or otherwise avoid harm by failing to report Mykytiuk. According to Walton, the first incidents of sexually harassing behavior occurred on June 14 and 15 of 1999, when Mykytiuk allegedly fondled her and made inappropriate comments in her presence. Walton argued, among other things, that the delay in filing her complaint was reasonable due to her fear that she might lose her job. As we noted supra, that argument is simply not tenable here. Walton did not suggest in the court below that her failure to complain prior to the sexual assault was reasonable

44

because she had no reason to believe that there would be additional harassment.[18] The district court, therefore, had no occasion to decide whether a genuine issue of material fact existed as to the reasonableness of Walton's failure to report the earlier fondling incidents. As a general rule, we do not consider arguments raised for the first time on appeal. See Wright v. Hanna Steel Corp., 270 F.3d 1336, 1342 (11th Cir.2001). Though there are exceptions to this rule, particularly in cases involving pure legal questions, see, e.g., United States v. One Single Family Residence Located at 18755 North Bay Road, Miami, 13 F.3d 1493, 1498 (11th Cir. 1994) (addressing issue not raised below because it involved a pure legal question and failure to address it would have resulted in a miscarriage of justice), those exceptions do not apply here.[19] Consequently, we decline to consider

---

[18]Walton did not, for instance, cite any of the cases discussed supra (Greene, Todd, or Indest) for the proposition that Ortho should be held liable for the sexual assault because that harassment was unavoidable.

[19]Walton did argue below that her delay was reasonable because she told her supervisor that his advances were unwelcome. However, she did not focus in the district court on her protests with respect to Mykytiuk's June 14 pass at her nor her protests when his harassment escalated the very next day into groping of her breasts and buttocks. She did not argue that she was reasonable in believing that her protests as of that time would be sufficient to prevent any further harassment. Indeed, Walton made no specific argument with respect to the reasonableness of her actions before June 29. In other words, Walton made no argument singling out Ortho's liability for the alleged rape that occurred on June 29. Had Walton made such arguments below, defendants and the district court could have addressed the reasonableness of Walton's actions as of that time to avoid harm. Indeed, it is possible that defendants might have been able to adduce additional evidence relevant to that discrete issue (e.g., additional evidence relevant to the reasonableness of Walton's accompanying an intoxicated Mykytiuk to the apartment that June 29 evening). Because Walton did not press this theory in the district court, we decline to entertain it for the first time on appeal.

Walton's claim that her employer is liable for any actionable harassment that occurred prior to and including the initial sexual asault.  We conclude that Ortho is entitled, as a matter of law, to the Faragher defense and that, at least under the circumstances of this case, that defense is a complete one.

The judgment of the district court is hereby **AFFIRMED**.[20]

---

[20]We also affirm the district court's judgment with respect to Walton's other federal and state law claims.  Because we conclude that her arguments in support of those claims are lacking in merit, an extended discussion of those claims is unnecessary.