# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 14, 2008          Decided July 10, 2009

No. 07-5401

RUBY TAYLOR,
APPELLANT

v.

HILDA L. SOLIS, SECRETARY OF LABOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01761)

*Richard L. Swick* argued the cause for appellant. On the briefs were *David H. Shapiro* and *Alana M. Hecht*.

*Kenneth Adebonojo*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, *R. Craig Lawrence*, Assistant U.S. Attorney, and *Judith R. Starr*, Counsel, Pension Benefit Guaranty Corporation.

Before: GINSBURG, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Dissenting opinion filed by *Circuit Judge* ROGERS.

GINSBURG, *Circuit Judge*: Ruby Taylor, an African-American woman, sued her employer, the Pension Benefit Guaranty Corporation, under Title VII of the Civil Rights Act of 1964, claiming her supervisors sexually harassed her to the point of creating a hostile work environment and, when she complained, retaliated against her. The district court granted summary judgment to the Corporation because it concluded, as a matter of law, (1) the employer had an affirmative defense to Taylor's claim of sexual harassment and, (2) with regard to retaliation, Taylor (a) had not offered a prima facie showing that her protected activity caused most of the alleged acts of retaliation, (b) had failed to show one such act was a materially adverse action, and (c) had failed to rebut the Corporation's nondiscriminatory explanation of another. We affirm, holding as a matter of law that the PBGC has an affirmative defense to the claim of sexual harassment and that Taylor has failed to meet her burden regarding the claim of retaliation.

## I. Background

We accept as true the evidence offered by, and draw all reasonable inferences in favor of, Taylor, who at all relevant times was an auditor in the Pre-Termination Process Division (PPD) of the PBGC.[*] Taylor's direct supervisor was Jonathan Henkel, who oversaw all the auditors in the PPD. Robert Bacon oversaw all the financial analysts in the PPD. Bacon and Henkel reported to Robert Joy, the manager of the PPD,

---

[*] The PBGC is a nonprofit corporation "established within the Department of Labor," 29 U.S.C. § 1302(a), and the Secretary of Labor is the Chairman of its Board of Directors, *id.* § 1302(d).

who reported to Bennie Hagans, Director of the Insurance Operations Department (IOD).

The Corporation's policy against sexual harassment directs employees who believe they have been sexually harassed "immediately [to] contact an EEO Counselor or the EEO Manager," who is to investigate the charge of harassment and, if warranted, implement an appropriate remedy. The policy also states the "PBGC's managers and supervisors have a particular responsibility for providing a work environment free of ... sexual harassment."

Taylor alleges her supervisors created a sexually charged atmosphere at the PPD. Henkel, Joy, and Hagans occasionally flirted with female employees, but particularly offensive to Taylor was a summer 2001 scavenger hunt, undertaken as a "team building exercise," during which, in order to earn points for a "wow," a female coworker produced a yellow brassiere from her gym bag, and a male coworker asked Taylor, who had red hair, if her hair was red "all over." Bacon and Henkel awarded Taylor's team bonus points for what Henkel referred to as this "embarrassing moment."

According to Taylor, Bacon began in 2001 to engage in frequent acts of harassment. Although Taylor and Bacon had been running partners for nearly a year, Taylor stopped running with him in the summer of 2001 because she felt he had overstepped the bounds of a professional relationship. In October Bacon told Taylor he could persuade Henkel to give her a good performance evaluation. When Henkel did so, Bacon asked her, "what are you going to do for me?" Around the same time, Taylor posted on her office door an October 2, 2001 e-mail detailing the Corporation's policy concerning sexual harassment. In or before November Bacon began intimating Taylor was not in love with her fiancé, saying he

could beat him up. Taylor confided in her friend, David Smith, a team leader in the IOD, that she felt harassed; he did not advise her to go to the EEO Counselor, nor did he do so himself.

Also in 2001 Taylor confronted Bacon and threatened to report him if he did not stop sexually harassing her. Bacon said that because he was a "nice guy," everyone "would think ... [she was] the problem." On April 3, 2002 Bacon saw Taylor in the hall and, referring to her uncovered arms, said, "I see you flaunting that black." The next day, when Bacon entered her office, Taylor kept her back to him; Bacon asked repeatedly, "what did I tell you about turning your back to me when I'm talking to you," which Taylor ascribed to a desire on his part to "see my legs or chest." A day later Bacon, finding Taylor alone in the copy room, walked toward her with his hands raised as if, in her view, he was preparing to choke her. When she protested, he did not touch her, but he called her "baby" and said he would touch her if he wanted.

Taylor reported Bacon's conduct on April 9, 2002. She first filed a complaint with the PBGC's internal investigator, who did not find a violation of the Corporation's policy. When her complaint to the EEO office had proved unavailing, she brought this suit in the district court on August 19, 2003.

Taylor alleges her supervisors retaliated against her in response to her complaint and her lawsuit. In 2002 Hagans criticized her "negative behaviors." Joy and Henkel, who had evaluated her job performance as "Outstanding" in 2001, rated her work "Excellent" in 2002 and "Fully Effective" in 2003, and in the third quarter of 2003 required her to submit biweekly reports of her progress on pending cases. In November 2003, after Taylor had submitted a confusing request for leave, Henkel, at the direction of the Human

Resources Department, listed Taylor as AWOL. (The listing was later rescinded and Taylor received back pay.) Finally, in 2004 Joy refused to recommend Taylor for a new position the PBGC considered creating but ultimately did not create. Taylor filed a second EEO complaint on February 5, 2004 and a second lawsuit on April 22, 2005, claiming continued harassment and retaliation.

The district court consolidated Taylor's lawsuits and granted the PBGC's motion for summary judgment. *See Taylor v. Chao*, 516 F. Supp. 2d 128, 130 (2007). With respect to Taylor's claim of sexual harassment, the court held the Corporation's anti-harassment policy and complaint procedure together with Taylor's delay in reporting Bacon provided, as a matter of law, an affirmative defense. *Id.* at 134–35. In the alternative, the court held Taylor had not shown a reasonable jury could find her supervisors' conduct created a hostile environment. *Id.* at 135–37. As for retaliation, the court concluded, with respect to most of Taylor's claims, she had not produced prima facie evidence showing her filing the April 2002 complaint caused her supervisors to retaliate against her. *Id.* at 138. The court also held Hagans's criticism of Taylor's "negative behaviors" was not a "materially adverse act." *Id.* at 137–38. Finally, the court held Taylor had made out a prima facie case of retaliation with respect to the performance evaluation she received in 2002 but had failed to rebut the PBGC's legitimate explanation for that evaluation. *Id.* at 138–39.

## II. Analysis

We review the judgment of the district court *de novo*. *See Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008). We begin with Taylor's claim of sexual harassment and then turn to her claim of retaliation.

A.  Sexual Harassment

Title VII provides: "All personnel actions affecting employees ... in executive agencies ... shall be made free from any discrimination based on ... sex," 42 U.S.C. § 2000e-16(a), and thus makes it unlawful for a supervisor in a covered federal agency to create a hostile environment based upon an employee's sex. *See Bundy v. Jackson*, 641 F.2d 934, 944–46 (D.C. Cir. 1981). Sexual harassment creates a hostile environment only if it is so "severe or pervasive [as] to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). The employer has an affirmative defense to a hostile environment claim if (1) the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see also Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998).

The PBGC argues Taylor was not subjected to a hostile work environment and, in any event, the district court correctly held the employer had an affirmative defense because Taylor unreasonably failed to use its complaint procedure. *See Ellerth*, 524 U.S. at 765 ("any unreasonable failure to use any complaint procedure provided by the employer ... will normally suffice to satisfy the employer's burden"). Taylor does not challenge the adequacy of the Corporation's procedure. Therefore, the PBGC may avoid liability if it shows "that, as a matter of law, a reasonable person in [Taylor's] place would have come forward early enough to prevent [the] harassment from becoming 'severe or

pervasive.'"  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

We agree with the district court and the PBGC that a reasonable employee in Taylor's position would have come forward in October or November 2001, when Taylor instead posted the PBGC's sexual harassment policy on her office door and told her friend Smith that Bacon had been sexually harassing her.  A reasonable employee who believes and tells others she is being sexually harassed would report it if she knows — as Taylor should have and apparently did know — a complaint procedure has been established for that purpose.[*] When Taylor finally did report Bacon's conduct in April 2002, the PBGC duly investigated and, even though it did not find harassment, *see Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (occasional vulgar banter not sexual harassment), the sort of conduct about which Taylor had complained did not recur.

Taylor argues she effectively notified the PBGC's management of her complaint in the fall of 2001 when she confided in her friend Smith.  Taylor, however, could not reasonably have believed talking to Smith was a substitute for using the agency's complaint procedure.  Although Smith, as

---

[*] The dissent deems it "irrelevant" "[w]hether Taylor herself believed she was being sexually harassed," Dissenting op. at 9, and suggests the court is "placing a more stringent reporting requirement on a more sensitive plaintiff," *id.* at 8.  A plaintiff who knows about her employer's complaint procedure and fails to use it even as she tells a manager she is being harassed runs head long into the prophylactic rule announced in *Faragher*, which was not designed to protect sensitive employees, but rather to encourage all employees to "avoid[] harm" when doing so is possible, and to ensure a plaintiff is not "reward[ed] … for what her own efforts could have avoided."  524 U.S. at 806–07.

a member of management, may have had, as the policy states, a "particular responsibility" to address workplace discrimination, he was neither Bacon's supervisor nor an EEO officer. The policy expressly required Taylor, if she believed she was being harassed, "immediately [to] contact an EEO Counselor or the EEO Manager." Having ignored the complaint procedure, Taylor cannot now complain that Smith should have filed a formal complaint on her behalf or himself reprimanded Bacon, who did not report to him.

Taylor also argues her report to Smith was sufficient in the light of *Bundy*, in which we held an employer vicariously liable for its supervisors' harassment of a subordinate. In *Bundy*, however, the employer, unlike the PBGC, had not established a sexual harassment policy with a complaint procedure. *See* 641 F.2d at 943, 947–48.

Taylor argues in the alternative that her delay in filing a complaint, from the fall of 2001 to April 2002, was not unreasonable. But, as the PBGC points out, an employee has a "prompt reporting duty under the prophylactic rules" approved in *Faragher*, and five or six months is "anything but prompt." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1306–07 (11th Cir. 2007) (three months and two weeks held an unreasonable delay). In reply Taylor notes a failure to complain may be reasonable in unusual circumstances, such as a "genuine [and] reasonable .... fear of retaliation." *Adams v. O'Reilly Auto., Inc.*, 538 F.3d 926, 932–33 (8th Cir. 2008) ("fear of retaliation" generally not an excuse for failing to report sexual harassment); *see also Roebuck v. Washington*, 408 F.3d 790, 795 (D.C. Cir. 2005) ("fear and uncertainty" about scope of employer's policy may in certain circumstances make employee's "delay in complaining reasonable").

Taylor suggests various "factors" show her delay was reasonable but only one warrants mention. According to Taylor's first EEO complaint, Bacon told her in 2001 "no one would believe" her if she reported him; "they would think ... [she was] the problem." A reasonable jury could not find Taylor was reasonably deterred by Bacon's statement. Bacon did not threaten Taylor with an adverse employment action and, indeed, he could not have done because he was not her supervisor and did not have the authority to evaluate her performance or to take any action against her. In fact, Bacon had no leverage at all with which to intimidate Taylor — apart from his assertion that those in authority would believe him and not her. And that is not enough to establish a credible fear of retaliation. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir. 2001) (rejecting as "speculative" and "generalized" employee's fear of retaliation based upon alleged friendship between president of corporation and alleged harasser, her supervisor); *id.* at 268 (rejecting view that "friendships should relieve an employee of her reporting obligation and effectively impose automatic liability on the employer"). Because "failure [would have been] the only cost" to Taylor of reporting Bacon in the fall of 2001, *see Reed v. MBNA Mktg. Sys.*, 333 F.3d 27, 36 (1st Cir. 2003); *see also Walton v. Johnson & Johnson Servs.*, 347 F.3d 1272, 1290–91 (11th Cir. 2003) (absent credible threat of retaliation, subjective fear of reprisal not an excuse for failure to report), no reasonable jury could find Taylor reasonably waited five or six months before reporting what she believed was sexual harassment.[*] We therefore affirm the

---

[*] *Roebuck*, which involved repeated harassment by and a threat from the employee's supervisor, is not to the contrary. *See* 408 F.3d at 791–92; Dissenting op. at 3 (noting that employee in *Roebuck* "alleged her supervisor ... had sexually harassed her"). Bacon had no supervisory authority over Taylor. In *Roebuck*, moreover, the question was whether "fear and uncertainty made

district court's judgment with respect to Taylor's first cause of action.

B. Retaliation

Under Title VII, it is unlawful for an employer "to discriminate against any of [its] employees ... because [she] has made a charge ... or participated in any manner in an investigation" of discrimination. 42 U.S.C. § 2000e-3(a); *see Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) ("general ban on retaliation in § 2000e-3(a)" applies to federal employers through § 2000e-16). In order to prevail upon a claim of unlawful retaliation, an employee must show "she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her." *Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007). A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *see Rochon*, 438 F.3d at 1219. The district court held Taylor had failed to show that her filing the April 2002 complaint had been the cause of four of the

[the employee's] delay in complaining reasonable" under the circumstances. 408 F.3d at 795. The dissent suggests Taylor may reasonably have been uncertain whether Bacon's conduct violated the PBGC's policy because the policy "defined sexual harassment in objective terms." Dissenting op. at 7. Taylor, however, was not at all uncertain; she believed and told others she was being harassed. Nor could a reasonable jury find Taylor was uncertain about what the PBGC's policy required of her: As Taylor acknowledged in both her EEO complaint and an affidavit, in October 2001 she posted on her door a PBGC e-mail that stated "[i]f you believe that you are a victim or witness to workplace harassment, please report it immediately to an EEO Official or Counselor."

reprisals she alleged, had failed to show material adversity with respect to one, and had failed to rebut the PBGC's nondiscriminatory explanation of another.[*]   *See Taylor*, 516 F. Supp. 2d at 138–39.  We affirm the district court on the ground that five of the six alleged reprisals were not materially adverse actions and Taylor cannot show the sixth was retaliatory.[**]

*First*.  Hagans criticized Taylor for exhibiting "negative behaviors."  The district court held, and we agree, that Hagans's criticism was not a materially adverse action.  *See*

---

[*] Retaliation claims based upon circumstantial evidence are governed by the three-step test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires the employee first to establish prima facie the elements of retaliation.  *See Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  If the plaintiff does so, then the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its action.  *Id.*  If the employer does so, then the court "need not — *and should not* — decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*," *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (disparate treatment claim); *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (retaliation claim); rather, the court should proceed to the question of retaliation *vel non*.  The court can resolve that question in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case — here that her employer took a materially adverse action against her.

[**] A circuit court is "justified in resolving an issue not passed on below ... where the proper resolution is beyond any doubt." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *see Jones*, 557 F.3d at 676 ("we may affirm a judgment on any ground the record supports," provided "the opposing party had a 'fair opportunity' to address" that ground).  Taylor, who had the burden of proof, had such an opportunity and took it; she engaged in extensive discovery aimed at proving retaliation.

*id.* at 138; *see also Burlington Northern*, 548 U.S. at 68 ("petty slights [and] minor annoyances" would not deter reasonable employee from making charge of discrimination).

*Second.* Henkel and Joy slowed the processing of Taylor's cases after she filed her complaint and Joy and Henkel required her (as they had some other auditors) to submit biweekly reports on the status of her work. Such minor "inconveniences and alteration of job responsibilities [do] not rise to the level of adverse action" necessary to support a claim. *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002); *see Wiley*, 511 F.3d at 161 (change in workload a trivial harm); *cf. Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) ("We have consistently declined to serve as a 'super-personnel department'"); *accord Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986).

*Third.* Joy did not recommend Taylor for a position the PBGC was considering creating but ultimately did not create. Although a refusal to promote is a materially adverse action, *see Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003), because there was no position to which she might have been promoted, Taylor was not denied a tangible opportunity to advance her career. *Cf. Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("evaluations and written warnings were not adverse actions because none had 'tangible job consequences'" (construing *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005))); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (plaintiff must show "reasonable trier of fact could conclude [she] has suffered objectively tangible harm"). In any event, Joy's non-recommendation for a hypothetical position would not have dissuaded a reasonable employee from coming forward.

13

*Fourth and fifth.*  Taylor's supervisors twice lowered her performance evaluation — from "Outstanding" in 2001, to "Excellent" in 2002, and to "Fully Effective" in 2003.  In order for a performance evaluation to be materially adverse, it must affect the employee's "position, grade level, salary, or promotion opportunities."  *See Baloch*, 550 F.3d at 1199.  Taylor's bare, conclusory allegation that she was denied promotional and bonus opportunities "[a]s a result of PBGC's unlawful conduct in violating Title VII's prohibition against retaliation" does not discharge her burden to show the evaluations were "attached to financial harms."  *Id.*

*Sixth*.  Taylor was temporarily listed as AWOL in the first or second week of November 2003.  Although the PBGC ultimately rescinded the listing and gave Taylor her lost pay, the temporary deprivation of wages counts as a materially adverse action.  *See Greer v. Paulson*, 505 F.3d 1306, 1317 (D.C. Cir. 2007) ("diminution in pay or benefits can [be adverse] even when the employer later provides back pay").

The Corporation offered a nondiscriminatory reason for the challenged action: The Human Resources Department directed Henkel to list Taylor as AWOL because the leave slip she submitted appeared to indicate Taylor had not obtained Henkel's prior approval, as all auditors were required to do.  After Taylor had returned to work and the confusion was eventually dispelled, the AWOL charge was rescinded and Taylor's pay restored.  We therefore move to the question of retaliation *vel non*, *see Jones*, 557 F.3d at 678, which in this instance reduces to whether a reasonable jury could find the Corporation's "proffered explanation is unworthy of credence," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Taylor rebuts the PBGC's explanation by asserting she contacted Henkel regarding her request for annual leave before she left the leave slip in his in-box. Although Henkel denies having given Taylor oral approval, we assume a reasonable jury could credit Taylor's account. Her account, however, does nothing to undermine the PBGC's explanation because in her opposition to the motion for summary judgment she acknowledged she erred in completing the request form by "mistakenly check[ing] the 'sick leave' box" but entering the dates in the area for annual leave. Henkel therefore asked Human Resources for direction and merely implemented their decision.* Once the confusion, which Taylor herself had created, was cleared up, her record was corrected and her pay was restored. Therefore, no reasonable jury could infer the PBGC retaliated against Taylor when it treated her as having taken leave without permission. *See Greer*, 505 F.3d at 1319–20.

Taylor's remaining arguments on this score are even further off the mark, but two do deserve mention. First, on appeal Taylor newly points out that the PBGC placed her on AWOL in November 2003, two and one-half months after she filed her first lawsuit; hence, she argues, "there is sufficient temporal proximity for a reasonable jury to find" the Corporation was retaliating against her.** On the contrary, an

---

* Although, as the dissent notes (at n.6), it appears from the face of the leave slip that Henkel first approved Taylor's request, he explained that as a matter of course he signed such slips when he received them. His change of position is consistent with the PBGC's explanation that Henkel, confused by Taylor's error in completing the slip, requested guidance from Human Resources.

** Taylor offers this argument to show she made out a prima facie case but, because she wants this case remanded to the district court for a trial on the merits, we take her argument as equally applicable to the issue before us.

inference of retaliatory motive based upon the "mere proximity" in time between Taylor's filing her first suit and the AWOL listing two and one-half months later would be untenable on the record here. *See Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine"); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (rejecting argument that "two-month period between [protected activity] and [employee's] discharge establishes a 'causal connection' between the two events" when employee had not pointed to other circumstances suggesting events were related); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating, "to establish a prima facie case ... the temporal proximity must be 'very close,'" and citing with approval case holding three month interval is, as a matter of law, not close enough); *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (holding employee failed to make out "causal link" required for prima facie case of retaliation because two months between protected activity and challenged action could not, as a matter of law, "justify a finding in [her] favor").

Second, Taylor argues the jury could infer either Henkel or the Human Resources Department or both retaliated against her because on more than one occasion after she filed her EEO complaint Henkel criticized her work and yelled at her and because her coworkers somehow learned she had been listed as AWOL. These incidents do not amount to the "pattern of antagonism" required for a reasonable jury to infer Henkel, much less Human Resources, was retaliating against Taylor. *Cf. Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997) ("plaintiff can establish a link between his or her protected behavior and [the alleged reprisal] if the

employer engaged in a pattern of antagonism in the intervening period"). The petty slights she describes, which would not qualify as adverse actions, *see Burlington Northern*, 548 U.S. at 68, likewise do not suffice to make out a case of retaliation, *see id.* ("Title VII ... does not set forth 'a general civility code for the American workplace'" (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998))).[*] In sum, the PBGC was entitled to summary judgment because Taylor has not provided a reasonable jury any basis upon which to disbelieve the PBGC's explanation of the AWOL incident.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

---

[*] Contrary to the suggestion that Taylor suffered retaliation by "a thousand cuts," Dissenting op. at 17, there is no such pattern of abuse here. The dissent merely assumes allegedly retaliatory acts were in fact retaliatory. *Id.* at 13–14, 17–18. Nor does the dissent explain how trivial actions on the part of Joy and Henkel could support a reasonable inference that the Human Resources Department acted with a retaliatory motive. *Id.* at 17–18.

ROGERS, *Circuit Judge*, dissenting.  Because a reasonable jury could find in appellant Ruby Taylor's favor, I would reverse the grant of summary judgment.  This is clear but for the court's failure in three instances to apply the correct legal standards.

**I.**

Upon review of the grant of summary judgment, it is not the role of the court to evaluate and weigh the proffered evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, this court must view the evidence before the district court in the light most favorable to the non-moving party — here, Taylor — and must accord her the benefit of all reasonable inferences. *Id.* at 255; *Salazar v. Washington Metro. Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005).  Yet the court has done the opposite, presenting the evidence in the light most unfavorable to Taylor and denying her the benefit of the reasonable inferences to which she is entitled.  How else could the court conclude, for instance, that Taylor was the cause of the temporary denial of a week's pay when she proffered evidence that she had cleared her leave from work with her supervisor in advance, that she had successfully requested leave in a similar fashion on prior occasions, and that her supervisor remembered approving the leave request?  This example is only one of several that demonstrates the manner in which applying the wrong standard of review infects the court's analysis.

Applying the correct standard of review, the evidence shows that Taylor had been an auditor for approximately ten years and had received an outstanding performance evaluation in 2001.  In a nutshell, she proffered evidence that she had been subject to casual sexual harassment by Robert Bacon beginning in the fall of 2001, that she was not fully informed of her options under her employer's sexual harassment procedures, that her harasser used his supervisory authority to intimidate her by suggesting that if she formally complained about his harassment

she would be punished and not him, that she complained to a member of management, David Smith, who did not recommend she report the harassment to anyone else, and that when the harassment intensified in the winter of 2001-02 to the point of becoming physically threatening, she filed a formal complaint in April 2002, as her employer's policy contemplated. Her fear that her supervisors would retaliate if she filed a formal complaint was realized soon thereafter. For example, Robert Joy, the manager of the Pre-termination Process Division in which Taylor worked, refused to recommend her for a job with another supervisor and told her harasser she had lied. Bennie Hagans, the head of the Insurance Operations Department and Joy's superior, warned her about her "negative behaviors." Her immediate supervisor, Jonathan Henkel, required for the first time that she submit biweekly reports of her progress on pending cases, which since she filed her complaint had consisted of less desirable, low priority cases. Her work was reviewed more slowly, even though her performance evaluations turned on productivity, with the result that she was downgraded from "outstanding" to "excellent" in 2002 and further downgraded to "fully effective" in 2003. Then, a mere two and one half months after she filed a complaint in the district court, she was denied a week's pay for an unknown period of time when Henkel placed on absent without leave ("AWOL") status, even though she had obtained leave permission from him in advance and he recalled approving it. Taylor filed a second complaint in February 2004.

Viewing this evidence in the aggregate and according Taylor favorable inferences, a reasonable jury could find she proved hostile environment sex discrimination and retaliation. For purposes of surviving summary judgment, she has overcome the two hurdles that the court identifies.

## II.

*Delay in reporting sexual harassment.* On the question whether Taylor's sexual harassment claims are barred because of her delay in filing a formal complaint, this court held in *Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999), that an employer is not entitled to summary judgment under the second element of a *Faragher/Ellerth* affirmative defense[1] unless it shows that, "as a matter of law, a reasonable person in [the employee's] place would have come forward early enough to prevent [the] harassment from becoming 'severe or pervasive,'" *id.* at 675. This is an objective standard, and a genuine issue of material fact remains as to whether a reasonable person in Taylor's position would have reported any occurrences prior to the April 5, 2002 copy room incident. Contrary to binding precedent, however, the court converts this objective standard into one that is subjective, Op. at 7, and so errs. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

*Roebuck v. Washington*, 408 F.3d 790 (D.C. Cir. 2005), is instructive in demonstrating there is a material issue of disputed fact. There, Linda Roebuck, an administrative assistant in the D.C. Department of Corrections, alleged her supervisor Mr. Corbett had sexually harassed her, *id.* at 791. Roebuck

---

[1] In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court held that employers have an affirmative defense against actionable hostile environment claims when no tangible employment action is taken against the employee-plaintiff. The defense has two necessary elements: (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

presented evidence that Corbett had sexually harassed her "off and on," *id.*, for almost two years beginning in 1995, *id.* When he was promoted to Deputy Warden in August 1997, he requested Roebuck's transfer to his office and "resumed harassing her." *Id.* During October 1997 through January of the following year, his harassment intensified. For example, he left a note reading "Sexy" on a stack of her work assignments, made suggestive hand gestures, and several times tried to kiss her. *Id.* at 791-92. The final straw came on January 16, when Corbett called Roebuck into his office, where he had "bedroom music" playing, and simply stared at her, saying nothing. *Id.* at 792. When Roebuck asked what he wanted, he just kept staring. *Id.* Roebuck left, but Corbett immediately called her back and resumed his silent staring. *Id.* On January 21, Roebuck formally complained to a lieutenant that Corbett was sexually harassing her. *Id.* The jury rejected her claims against her employer, finding that two years was an unreasonable amount of time to wait to file a complaint. *Id.*. Although this court affirmed, it concluded that "*[u]pon this record, a reasonable jury certainly could have found in Roebuck's favor*." *Id.* at 796 (emphasis added). *Cf. Watts v. Kroger Co.*, 170 F.3d 505 (5th Cir. 1999).

Assuming the truth of the statements proffered by Taylor, *see Greene*, 164 F.3d at 674, and granting her all favorable inferences from her evidence, *Anderson*, 477 U.S. at 255, Taylor's case bears a striking resemblance to the escalating harassment in *Roebuck*, and a reasonable jury "could certainly [find]" in Taylor's favor, concluding that a reasonable person in her position would not have reported Bacon's conduct prior to April 2002, when his harassment intensified and assumed a more dangerous and threatening character than it had before. The "off and on" 2001 incidents were fleeting and resembled the "simple teasing" and "offhand comments" that do not amount to actionable harassment, *Faragher*, 524 U.S. at 788, and a jury

might well find a reasonable person would not report them. The April incidents, by contrast, were more explicit and physically charged, centering on Taylor's physical appearance, and occurred on consecutive days. On April 3, Bacon told Taylor that she was "flaunting that black," referring to her exposed arms. On April 4, when she turned her head but not her body to acknowledge him as he came into her office, he motioned with his hand that she should turn around. After she refused , he kept motioning with his hand that she should turn around, saying, "What did I tell you about turning your back to me? You'd better turn around when I'm talking to you." Taylor averred that "this was the entire conversation," and that he wanted her to turn around so that he could see her chest and legs. On April 5, the two met in the copy room, at which point Bacon approached her with his hands raised as if he were going to choke her. When she told him not to touch her, he said, "I'll touch you if I want to. I can do what I want to." During that incident, he also called her "baby" and told her to "go ahead [and report him]. Go tell Robert [Bacon's supervisor]. He won't do anything. He likes me too much." Taylor formally reported this behavior on April 9.

This increasingly physical and aggressive series of April incidents stand in stark contrast to prior incidents — the most serious of which were the "red all over" comment made, not by Bacon, but by Taylor's coworker whom Bacon awarded with bonus points for the "embarrassing" moment, and Bacon's inquiry after she received an outstanding performance evaluation about what was she going to do for him. Other incidents were on the level of Bacon mentioning to Taylor that he wanted to be "her friend" or that she did not actually love her fiancé and that he could "beat him," conduct that could be described as casual "off and on" harassment, *Roebuck*, 408 F.3d at 791. Furthermore, the challenged events lasted, at most, seven months until Taylor formally reported them, as opposed

to the two years during which Roebuck endured such harassment before it intensified and she formally complained.[2]

Although the lesser "off and on" incidents contribute to the atmospheric element of a hostile environment sex discrimination claim, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002), a reasonable jury could find they were not yet so startling or foreboding that a reasonable person in Taylor's position would have come forward earlier to prevent Bacon's harassment from becoming as severe and pervasive as it became in April 2002. Her employer's sexual harassment policy contemplated that employees would not file formal complaints until the harassment had become objectively severe, when the employee "*reasonably* perceived [such conduct] as creating a hostile or abusive work environment." Policy Statement on the Prevention of Sexual Harassment, PBGC Notice No. 96-11

---

[2] The court makes no attempt to explain how Bacon's conduct prior to April 2002 differs from the "off and on" harassment that Roebuck endured before Corbett's harassment escalated and she filed a formal complaint. Although it attempts to distinguish *Roebuck* on the ground that "the question [there] was whether 'fear and uncertainty made [the employee's] delay in complaining reasonable,'" Op. at 9-10 n.* (quoting *Roebuck*, 408 F.3d at 795) (second alteration in original), Roebuck's supervisor threatened retaliation less than a month before she complained in January 1998, and her uncertainty about whether the employer's sexual harassment policy applied to conduct outside of the workplace extended at most to October of the previous year. Yet her supervisor had been harassing her "off and on" for nearly *two years* prior; "fear and uncertainty" thus came into play only after a long period of ongoing harassment. The court offers no reason why Roebuck's two-year delay in reporting any of this "off and on" harassment was excusable, *see Roebuck*, 408 F.3d at 796, while Taylor's *at most* seven month delay is not.

(emphasis added).[3]   In doing so, the employer sought to curb "sexual harassment" in terms of "unwelcome sexual advances and requests for sexual favors" that have real work-related consequences, not casual, unwanted flirtation or trivial slights.

Reviewing Taylor's proffered evidence, however, the court errs with respect to the legal standard for determining when, under *Faragher* and *Greene*, an employee must take advantage of her employer's corrective procedures.   Despite directly relevant precedent and the employer's sexual harassment policy that defined sexual harassment in objective terms, the court holds, as a matter of law, that Taylor should have reported Bacon's harassment in "October or November of 2001" because "[a] reasonable employee who believes and tells others she is being sexually harassed would report it." Op. at 7.  This holding abandons binding precedent by converting what was heretofore a legally *objective* inquiry into when an employee should have reported harassment, *Greene*, 164 F.3d at 675, into one that is now *subjective*.  The court accomplishes this conversion by sleight of hand, recasting *Greene*'s objective standard in terms

---

[3]  The Policy Statement defined "sexual harassment" as:

[v]erbal or physical conduct of a sexual nature, including unwelcome sexual advances and requests for sexual favors . . . when:
a.      submission to such conduct is made *explicitly* either a term or condition of an individual's employment;
b.      submission to or rejection of such conduct by an individual is *used* as the basis for employment decisions affecting such individual; or
c.      such conduct is *reasonably* perceived as creating a hostile or abusive work environment.

Policy Statement on the Prevention of Sexual Harassment, PBGC Notice No. 96-11 (emphasis added).

of the employee's subjective belief. Yet the purpose of an objective standard is to provide a frame of reference that excludes an individual's subjective belief. Otherwise, an objective test would be meaningless and, in this type of case, would have the unintended consequence of placing a more stringent reporting requirement on a more sensitive plaintiff, who may believe she is being sexually harassed when, in fact, a reasonable person would disagree.

Under the correct legal standard — whether an employee who *reasonably believes* she is being sexually harassed would report it or was *unreasonable* in not reporting it — it is for a jury to decide whether Taylor should reasonably have believed she was being sexually harassed in a manner that required reporting. On this record, a reasonable jury could find that the fall 2001 incidents were not so startling or foreboding a reasonable person would have reported them to prevent escalation and/or that the employer's objective sexual harassment policy did not cover Bacon's pre-April 2002 conduct, which became reportable only when it escalated from "off and on" comments to physically aggressive advances. In either instance, Taylor's decision not to report earlier would be reasonable. The affidavit of supervisor David Smith supports both of these inferences, stating that Taylor became more and more upset with Bacon's behavior, that Smith "guess[ed]" Bacon's behavior began around September or the fall of 2001, and that "[i]t was a gradual thing. . . . [I]t gradually *over the months*, it got to be pretty severe." Smith Aff. 6-7 (emphasis added). The court's response, that Taylor believed she was being harassed in "October or November 2001" because she "posted the [employer's] sexual harassment policy on her office door and told her friend Smith that Bacon had been sexually harassing her," Op. at 7, is a red herring, ignoring both the objective tests articulated in *Faragher* and *Greene* as well as the employer's objective sexual harassment

policy, and misdirecting the relevant inquiry.[4] Whether Taylor herself believed she was being sexually harassed is irrelevant under all applicable standards.

As further evidence on which a jury could base a finding that Taylor did not unreasonably delay in reporting Bacon's conduct, Taylor proffered evidence that Bacon at least twice threatened retaliation if she complained about him. In addition to the copy room incident, Bacon had previously told Taylor that if she "said something, they would think that [she was] the

---

[4] The court misreads Taylor's EEO complaint, Op. at 7, 10 n.*, which does not state that she posted the sexual harassment policy on her door in response to Bacon's conduct towards her, but rather — and only — that she posted it in response to "several incidents with the PPD management staff that I think are incidents of harassment so that was my subtle way to say look at this, stop, you are behaving in this manner, be careful." EEO Compl. Att. 8. Taylor makes no mention here whether these "incidents" related to her specifically; at the summary judgment stage, the court must view the facts in the light most favorable to her and conclude they did not.

Moreover, the court fails to acknowledge what the court in *Roebuck* presumed, namely the wide gulf between a layperson's use of the word "harassment" to try to prevent inquiry into her personal affairs, and a court's use of the same word as a term of art to express a legal conclusion under *Faragher* and *Meritor*. For instance, a male boss who calls a female employee "honey" or "sweetie" may provoke a response to stop "sexually harassing me" or a complaint to a friend that she is being "sexually harassed," but she would be wrong as a legal matter if she thought such conduct, without more, was actionable or that the incident merited reporting under the policy of Taylor's employer. So too with Taylor's statements to Bacon in response to him telling her he "bet [he] could beat [her boyfriend]" or to Smith when she complained about Bacon's behavior.

problem, not him." In *Roebuck*, the court held "whether fear [of retaliation] and uncertainty [about the scope of the employer's policy] made Roebuck's delay in complaining reasonable was for the jury to decide." *Roebuck*, 408 F.3d at 795. Here too there is a material issue of fact for the jury to resolve. To avoid this conclusion the court instead evaluates Taylor's evidence to find that Bacon had "no leverage at all with which to intimidate Taylor" because he was not her supervisor. Op. at 9. But Taylor proffered undisputed evidence that Bacon had told her he could get her an outstanding performance evaluation because he, her immediate supervisor (Henkel), and their supervisor (Joy) would as a group discuss what ratings to give subordinates, and that Bacon took credit when she received her outstanding evaluation. Further, it was undisputed that Bacon and Henkel socialized together and were "golfing buddies" who played golf approximately ten times a year. A reasonable jury could find that, faced with such management solidarity, any perceived delay in reporting Bacon's conduct was reasonable.

The cases on which the court relies do not dictate a contrary conclusion. For instance, although the Fourth Circuit in *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262 (4th Cir. 2001), rejected the "argument that reporting sexual harassment is rendered futile merely because members of the management team happen to be friends," *id.* at 268, the court overlooks both the different evidence Taylor offered regarding Bacon's ability to get her an outstanding evaluation and the difference that the Fourth Circuit drew between fear of futility and fear of retaliation. That court's statement referred to futility and responded to employee Barrett's contention that she failed to report her supervisor's behavior because he was friends with management and she "did not think it would do any good." *Id.* In this respect, "the only cost" to Barrett would have been failure to prevail upon filing a complaint, as she had no objective reason to fear retaliation. *See Reed v. MBNA Mktg.*

*Sys.*, 333 F.3d 27, 36 (1st Cir. 2003). Yet the Fourth Circuit made no similar statement regarding fear of retaliation, stating only that "generalized" and "nebulous" fear of retaliation would not suffice to explain a delay in reporting. *Barrett*, 240 F.3d at 267. Here, by contrast, Taylor presented evidence from which a reasonable jury could find that she had a specific, "credible," *Reed*, 333 F.3d at 36, reason to fear retaliation that was not merely "generalized," *Barrett*, 240 F.3d at 267, "nebulous," *id.*, or "subjective," *Walton v. Johnson & Johnson Servs.*, 347 F.3d 1272, 1290 (11th Cir. 2003). "[F]ailure" was therefore *not* "'the only cost' to Taylor of reporting Bacon in the fall of 2001," Op. at 9 (quoting *Reed*, 333 F.3d at 36), and a jury could find that any reasonable delay was justified under the circumstances. With favorable inferences, Taylor's fear was no less substantiated than Roebuck's, whose supervisor commented only once, vaguely, that he did not want to "find out [she] was taking sides with Lieutenant Clark," who had witnessed him trying to kiss Roebuck. *Roebuck*, 408 F.3d at 792. Indeed, Taylor's proffered evidence of retaliatory threats and conduct is stronger than was Roebuck's.

**III.**

*Retaliation.* The evidence Taylor proffered to show retaliation illustrates why an employee would hesitate before filing a complaint pursuant to an employer's sexual harassment policy. A complaint leads to an investigation that alerts the accused and other employees, including, as occurred here, the complaining employee's immediate supervisor (Henkel) and his superiors (Joy and Hagans), that the employee has filed a complaint against another supervisor (Bacon). That process may itself cause negative consequences for an employee regardless of the outcome of the employer's remedial process. Nonetheless, the high bar set for discrimination claims is no less high for claims of retaliation, *see Brown v. Brody*, 199 F.3d 446,

457 (D.C. Cir. 1999), and an employee may recover damages only for those instances of retaliation that resulted in a "materially adverse" action. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 68-69 (2006).

As with Taylor's sexual harassment claim, the court improperly, and with great consequence, denies Taylor the benefit of reasonable and favorable inferences from the evidence. *E.g.* Op. at 15 (concluding an inference of retaliatory motive would be "untenable on the record here" where based on "'mere proximity'" between the time she filed suit and the AWOL listing). It also disaggregates her evidence, Op. at 11-13, when the legal standard requires it to be viewed in the aggregate. Although correctly concluding that the withholding of pay due pursuant to the "AWOL" incident was a materially adverse action, Op. at 13, the court weighs and evaluates conflicting evidence in holding that Taylor failed to rebut her supervisor's non-discriminatory reason for placing her on AWOL status, Op. at 14. Dissecting the portrait of her work experiences after she formally complained, Op. at 11-16, and failing to view the evidence in the aggregate, the court concludes that "Taylor herself had created" "the confusion" with regards to this incident. Viewed under the correct legal standard, however, Taylor has raised a material issue of disputed fact on which a reasonable jury could find in her favor.

Taylor's retaliation claim is governed by the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Taylor proffered evidence establishing a prima facie case of unlawful retaliation. After engaging in statutorily protected activity when she reported Bacon, her supervisor (Henkel) claimed she was AWOL even though she had followed the usual procedures for requesting leave, and denied her a week of earned pay, withholding it for an unknown period of time. As the court holds, that withholding

was a materially adverse action.  Op. at 14.  However, the court's subsequent analysis fails both to acknowledge the aggregate effect of Taylor's evidence of a causal connection between the protected activity and the adverse action and to accord her favorable inferences.

In *Greer v. Paulson*, 505 F.3d 1306 (D.C. Cir. 2007), this court held, "After the employer offers a non-[retaliatory] justification for its actions, the *McDonnell Douglas* [] framework falls away, and [the court] must determine whether a reasonable jury . . . could infer [retaliation] from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to the plaintiff," *id.* at 1318 (third alteration and ellipsis in original; internal quotation marks omitted) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)); *see Singletary v. Dist. of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003) (applying *McDonnell Douglas* to a retaliation claim).  *Greer* makes clear that all instances of retaliation, whether or not they are individually actionable under *Burlington Northern*, are relevant to this determination because they shed light on whether actionable conduct was retaliatory in nature. As the First Circuit has pointed out, "the critical inquiry becomes whether the *aggregate evidence of pretext and retaliatory animus* suffices to make out a jury question." *Mesnick v. Gen. Elec. Co*, 950 F.2d 816, 827 (1st Cir. 1991) (emphasis added).

Taylor's proffered evidence pointed to a series of actions that adversely affected her ability to do her job.  For example, there was evidence that as a result of her formal complaint, her immediate supervisor (Henkel) held up her work, delaying its submission to the Office of General Counsel, and assigned her low priority cases, all resulting in a lower level of productivity

for the twelve-month period than in previous years. Where performance evaluations are directly correlated to productivity, as was true in Taylor's employment situation, these actions necessarily resulted in steadily declining evaluations, from "outstanding" to "excellent" in 2002, and from "excellent" to "fully effective" in 2003. Taylor expressed fear that if they continued to decline she might receive an "unacceptable," which is grounds for dismissal. As further examples, there was evidence that her second level supervisor (Joy) with whom she rarely spoke, had recommended she not be hired by another supervisor because he did not trust Taylor, that he had advised Bacon not to go by her office "because she could take this, you know, as a way to tell another lie," Bacon Depo. at 102, and that her third-level supervisor (Hagans) warned her about her "negative behaviors."

When viewed in context with other proffered instances of management retaliation, and contrary to the court's impermissible weighing and disaggregation of the evidence against Taylor, a reasonable jury could disbelieve her supervisor's claimed reason for placing her on AWOL status and instead credit Taylor's account of what transpired. *See Aka*, 156 F.3d at 1290 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)) . According to Taylor, she requested leave in person and Henkel approved it informally, a practice that he admits is standard, acknowledging that in the past he signed her leave slips even after her leave had begun. Henkel thus knew exactly what type of leave she was requesting and which dates she would be out of the office. Nonetheless, seeing an opportunity to make her life more difficult in view of her complaint against his supervisor-friend and golfing buddy, when he noticed she checked the box for sick leave but placed the dates she would be out on a line above (next to annual leave), he claimed "confusion" and reported her to Human Resources, which, as an experienced supervisor, he knew would

instruct him to designate her AWOL. There was no evidence that Human Resources would have so instructed had he not referred her request or had he advised, based on the conversation Taylor avers she had with him, what type of leave she wanted. There is no evidence, in fact, that Human Resources routinely reviewed these request forms when they were approved by the employee's supervisor.

The court would instead improperly credit her employer's account of the events, stating that Henkel, "confused" by Taylor's "err[or] in completing the request form by 'mistakenly check[ing] the sick leave box' but entering the dates in the area for annual leave," Op. at 14 & n.* (second alteration in original) (quoting Taylor's Opp. to Mot. Summ. J. at 37), requested guidance from Human Resources.[5] The court relies on her supervisor's incomprehensible affidavit testimony: "Well, there was some confusion as to whether it was sick leave or annual leave. When I talked to personnel basically they said if it was sick leave cause [sic] she put the sign at the time for leave in the annual spot, but she checked off the sick leave portion of it, so I didn't know if she was on sick leave or annual leave." Henkel Aff. 9. This hardly establishes undisputedly that Taylor was the cause of any "confusion." Admitting in the same affidavit that during the years he had been her supervisor there had never been a problem with Taylor's leave, Henkel claimed "personnel" directed she be placed on AWOL because she had not received his prior approval. *Id.* at 10. This is not the same

---

[5] To the extent the court interprets this statement, which appeared only as a parenthetical in Taylor's opposition to the motion for summary judgment, as an acknowledgment of her error in completing the form, the court ignores the more obvious contextual interpretation that Taylor was recounting Henkel's claimed basis for "confusion," not confessing error. Again, the court views the record in the light least favorable to Taylor.

explanation for disapproval as the "confusion" he identified earlier. Moreover, the leave request slip, on which the court also relies, belies the "confusion" explanation.[6] On that request Henkel wrote in longhand that he "did not receive [the leave request] until Friday afternoon 10/31" and that "I'm assuming prior arrangements were made for this leave but no arrangements were made with me." This explanation makes no reference to "confusion" about the type of leave requested. Moreover, Taylor averred that she had requested leave in person and cleared her leave with Henkel informally, a practice that he admits is standard and which in this instance would undermine any "confusion" claim about what type of leave she sought.

Given Taylor's evidence, Henkel's affidavit, and the leave request form showing what appear to be Henkel's handwritten alterations to a previously signed and approved document, a material issue of disputed fact remains as to whether Henkel approved her leave as she claimed on October 31 or disapproved it on November 4 because of "confusion." Although his apparent change of position may, as the court suggests, be "consistent with the [employer]'s explanation that Henkel [was confused]," Op. at 14 n.*, the employer's explanation must be more than "consistent" to prevail on summary judgment; it must exist to the exclusion of another

---

[6] Taylor's leave request form has a typed "X" only in the box marked "Accrued Sick Leave," which appears in a column listing various types of leave, and a typed listing of the dates on the first line to show when she would be out and the number of work hours she would miss. Beside her signature in the "CERTIFICATION" box is typed "10/31/03" for the date of the request. By contrast, on the signature line for "OFFICIAL ACTION ON REQUEST," the "X" next to "APPROVED" is scratched out and an "X" appears next to "DISAPPROVED". On the signature line, following Henkel's signature is the handwritten date "11/04/03," which is written over the handwritten date, "10/31/03," effectively crossing out that date.

also consistent explanation that favors the nonmoving party in order to demonstrate entitlement to a judgment as a matter of law. FED. R. CIV. P. 56(c); s*ee Anderson*, 477 U.S. at 247. Here, that other explanation is that Henkel conjured up a "confusion" rationale, an account supported by, for example, the inconsistency between his affidavit testimony that he did not find out about Taylor's leave until he came back to work in November 2003 and the leave slip itself, on which he acknowledged receiving it on October 31, 2003, and which he appears to have signed and dated the same day. *See supra* n.6; *Aka*, 156 F.3d at 1290.

Reaching the opposite conclusion by crediting the employer's "confusion" explanation, the court compounds its error by improperly disaggregating Taylor's evidence and disregarding all proffered instances of retaliation that it concludes were not materially adverse. In doing so, the court fundamentally misconceives the relevance of this evidence. Even assuming these events are not themselves legally viable adverse actions, they are nonetheless evidence that the withholding of pay, an undisputedly viable adverse action, was retaliatory, and the court offers no good explanation for its disregard of those acts when it concludes otherwise. Nor can it. Just as Taylor's counsel offered "revenge is a dish best served cold," Oral Arg. at 32:04, retaliation can involve "a thousand cuts," *Patterson v. Whitman*, No. 02-2213, 2003 U.S. Dist. LEXIS 26726, at *8 (D.D.C. June 9, 2003). Where one of those cuts was a materially adverse action, it blinks reality to suggest the other 999 shed no light on whether that cut was intentional and retaliatory.

The court objects that it cannot "merely assume[] allegedly retaliatory acts were in fact retaliatory." Op. at 16 n.*. At summary judgment, however, that is exactly what the court must do. Taylor proffered evidence of a pattern of managerial

retaliation, and properly viewed, her evidence is not so untenable as to merit dismissal at this stage of the proceedings. Verbal reprimands for "negative behaviors," telling other supervisors that an employee cannot be trusted and tells "lie[s]," and slowed work processing that inevitably results in steadily declining performance evaluations that — if continued — could result in dismissal are not "trivial actions," *id.*, even assuming they do not constitute actionable retaliation, *but see Russell v. Principi*, 257 F.3d 815, 818, 819 (D.C. Cir. 2001); *Weber v. Battista*, 494 F.3d 179, 185 (D.C. Cir. 2007). On this record, a reasonable jury could find that her supervisor's reporting her to Human Resources, when in similar circumstances in the past he had not, was one of a series of retaliatory acts that resulted in the denial of a week's pay for an unknown amount of time. The merits of this question are for the jury to decide, not this court.

\* \* \*

In summary, circuit courts of appeal have acknowledged the difficult position that employees face as a result of the Supreme Court's efforts in *Faragher* and *Ellerth* to limit vicarious liability for workplace sexual harassment. *See Reed*, 333 F.3d at 35; *Walton*, 347 F.3d at 1290; *Barrett*, 240 F.3d at 268. The dilemma for the victim is real: reporting casual flirtation too early likely results in exoneration for the harasser and workplace condemnation of the victim; reporting too late may bar relief altogether, even though the conduct has become progressively more severe. Navigating this tricky terrain, in *Roebuck* this court acknowledged on facts similar to Taylor's that a jury could have found the plaintiff was reasonable in not immediately reporting unwanted advances. *See also Greene*, 164 F.3d at 674-75. Because this court must accord Taylor as the nonmoving party all favorable inferences from the evidence, a reasonable jury could find she did not unreasonably delay in reporting harassment under her employer's policy establishing

an objective standard for reporting. It is no response to ignore, as the court does, the required standard of review and binding precedent on the substantive legal standards to be applied. The standard for reporting is an objective one, not the subjective one the court fashions today. A reasonable jury, viewing her proffered evidence in the aggregate, as the correct legal standard requires, also could find that her supervisor unlawfully retaliated against her for filing a formal complaint. The court can reach the opposite conclusion only by discarding that standard of review when it disaggregates and thereby discounts favorable evidence, denies Taylor the benefit of favorable inferences, and ignores the real world retaliatory consequences of the employer's actions. Whether a reasonable jury would find in Taylor's favor or conclude she is not credible is not the question before this court, only whether she can survive summary judgment. Essentially, the court overlooks that "all that is required [from the nonmoving party to defeat summary judgment] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). Accordingly, on this record I would reverse the grant of summary judgment and remand the case to the district court.